DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | CASE NO. 4:06 MJ 6049 |
| Plaintiff, ) | |
| ) | |
| v. ) | MEMORANDUM OPINION |
| ) | AND ORDER |
| Donna J. Moonda, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**I. INTRODUCTION**

A complaint has been filed against the defendant charging that "[o]n or about May 13, 2005, in Cuyahoga County in the Northern District of Ohio, . . . the defendant[ ] did travel in interstate commerce from Pennsylvania to Ohio, with the intent to kill Dr. Gulam Moonda, and in the course of, or as a result of, such travel placed Dr. Moonda in reasonable fear of death . . . and further resulted in the . . . death of Dr. Moonda, through the use of a dangerous weapon, to wit, a firearm" in violation of 18 U.S.C. §§ 2261A, 924(j) and 2.

The Court conducted a preliminary hearing in connection with the complaint on July 28, 2006, and determined that the defendant should be bound over to the Grand Jury for the Northern District of Ohio.[1]

---

[1] The preliminary hearing was conducted pursuant to Fed. R. Crim. P. 5.1. Rule 5.1(a) provides for a magistrate judge to conduct the preliminary hearing. The undersigned conducted the preliminary hearing because there was no available magistrate judge to preside over the preliminary hearing at the time it was scheduled. Fed. R. Crim. P. 1(c) declares that "[w]hen
(continued...)

(4:06 MJ 6049)

## II. DETENTION HEARING

The Court then conducted a detention hearing pursuant to 18 U.S.C. § 3142(f) of the Bail Reform Act. The government advocated detention. Counsel for the defendant proposed home detention for the defendant with the defendant's mother, Mrs. Dorothy Smouse, who incidentally was a witness to Dr. Moonda's death.

### A.     The Pretrial Services Report

The Pretrial Services Report provided the following information:

> **DEFENDANT HISTORY / RESIDENCE / FAMILY TIES:**
>
> Ms. Moonda was born on April 9, 1959, in Bedford, Pennsylvania, to Ross (deceased) and Dorothy Smouse. The defendant reports that she has resided at the above noted address for 16 years, however, if released today, she would reside with her mother at 1047 Christy Rd., Hermitage, Pennsylvania.
>
> Ms. Moonda reports she married Gulam Moonda in December 1990. He is deceased. She states she does not have children.
>
> The defendant reports to have graduated from Hermitage High School, Hermitage, Pennsylvania in 1977. She furthered her education with a Bachelor of Science in Nursing from Dusquesne

---

[1] (...continued)
these rules (the Federal Rules of Criminal Procedure) authorize a magistrate judge to act, any other federal judge may also act." The Local Rules for the Northern District of Ohio provide a procedure whereby, when an indictment is filed in a case that is related to another criminal case in the district, with the consent of the judge assigned to the new case and the judge who presided over the earlier related criminal case, the new case may be transferred to the judge who presided over the earlier case. As this branch of the court presided over *United States v. Damian Bradford*, Case No. 1:06 CR 160, in which Bradford was charged with the same crime as the defendant in this case, it was deemed appropriate for the undersigned judge to conduct the preliminary hearing.

(4:06 MJ 6049)

University, Pittsburgh, Pennsylvania; a Bachelor of Science in Anesthesiology from California University, California, Pennsylvania; and a Master's in Nursing from Case Western Reserve University, Cleveland, Ohio.

The defendant reports she has an expired passport, but is not aware of its current location.  The defendant advised, however, that she has not traveled internationally.  She stated she has not served in the armed forces.

**EMPLOYMENT HISTORY / FINANCIAL RESOURCES:**

Ms. Moonda is not employed.  Her [sic] reported her last employment was with University of Pittsburgh Medical Center, Greenville, Pennsylvania in February 2004.  She stated she worked there for a period of seven months prior to entering into a substance abuse treatment program.  According to records contained in an Autotrax Online Search, the defendant's nursing license expired in August 2005, and has not been renewed to date.

Prior to this employ, Ms. Moonda reports to have worked for Sharon Regional Hospital, Sharon, Pennsylvania for a period of 14 years.

**Assets:**
| | |
|---|---|
| 2000 Lincoln Continental | Value Unknown |
| Raymond Jones IRA | $125,000 |
| Raymond Jones Checking | $ 50,000 |
| First National Checking | $     800 |

| **Liabilities:** | **Balance** | **Monthly Payment** |
|---|---|---|
| Various Credit Cards | $25-28,000 | |
| Monthly Utilities | | $1,000 |

**HEALTH:**

Ms. Moonda reports to be in good health.  She stated that she is currently under the care of a psychiatrist, Dr. McFadden, of Community Counseling, Hermitage, Pennsylvania, due to circumstances related to the death of her husband.  She advised she is taking medication for depression and a sleep disorder.  Ms. Moonda stated she is not suicidal.

(4:06 MJ 6049)

> Ms. Moonda reports to have began [sic] the use of fentanyl in 1998, following the death of her father.  She entered Gateway Rehabilitation in February 2004, to address her addiction.  She stated she successfully completed the program in June 2004.  Since that time she reports attending support group meetings on a bi-weekly basis, at the direction of her Probation officer.
>
> On July 24, 2006, the defendant submitted a voluntary urine specimen which tested negative for controlled substances.
>
> **ASSESSMENT OF NON-APPEARANCE**
>
> While the defendant has been a resident of Western Pennsylvania and has family in the area, she is considered a serious flight risk.  If convicted, Ms. Moonda faces the possibility of life in prison, or the potential for the death penalty.  Additionally, the defendant has significant assets and an alleged expired passport which the defendant reports she cannot locate.
>
> **ASSESSMENT OF DANGER:**
>
> The defendant has a history of substance abuse and mental health problems.  Additionally, the nature and circumstances of the charges, as well as the fact that she was on probation at the time of the offense lead this officer to conclude that the defendant poses a significant danger to the community.
>
> **RECOMMENDATION:**
>
> Pretrial Services respectfully recommends that the defendant be detained as there is no condition or combination of conditions that will reasonably assure the appearance of the defendant as required and the safety of the community.

(4:06 MJ 6049)

**B.     The proffer offered by counsel for the defendant in support of her objection to an order of detention.**

The proffer included only the statement of defendant's counsel as follows:

> MR. SYNENBERG:   Thank you.
> Your Honor, we would proffer for the Court's consideration that Mrs. Moonda has known about this investigation and that she was the subject of this investigation for over 14 months, yet she has made no attempt to flee.
>
> In fact, this past weekend it was well publicized in the newspaper that charges were imminent, that Mr. Bradford was, in fact, going to cooperate with the government, and even knowing that knowledge, she made no attempt to flee.
>
> Your Honor, we would proffer for the record that she has satisfactorily met every condition of her – of the past 25 months in which she has been on probation, and under the supervised release of the – of her probation officer in Mercer County, that she has in fact taken a drug testing, Your Honor, we estimate approximately 100 times and has always been found to have a negative results.
>
> Judge, she has never violated it, she's never been in trouble before. We would proffer she has strong family ties and that, Judge, if this Court should determine that there is – there is conditions upon which she can be released, that her mother Mrs. Smouse who is in the courtroom here today would be willing to assume supervision for her and would also allow her to live in her home, Mrs. Smouse's home, on electronic home monitoring.

**C.     A summary of the government's case supporting the bindover to the Grand Jury and for an order of detention**

At the evidentiary hearing conducted on July 28, 2006, the government presented the testimony of Sergeant Dennis L. Goodhart of the Ohio State Highway Patrol.  In his capacity as being in charge of the criminal investigation unit of the Highway Patrol in the Cleveland office, he became involved in the investigation into the shooting death of Dr. Moonda on the Ohio

5

(4:06 MJ 6049)

Turnpike on the day of the killing. Goodhart related the details of the investigation beginning on the day of the killing on May 13, 2005. He described the interview of the defendant on the evening of the homicide and testified in part as follows:

> Q. And can you summarize for us first the defendant's interview that evening?
>
> A. Mrs. Moonda stated that they were traveling from Hermitage to Toledo to meet up with Farouq (spelling) which would be Dr. Moonda's nephew who just graduated from medical school
>
> They were looking to buy a house out there in the Toledo area.
>
> They left Hermitage, PA around 4:30 in the afternoon. She said they drove, they entered the Ohio turnpike, continued westbound on interstate 80. Arrived at a service plaza they're guessing somewhere around the 5:30 p.m. time.
>
> They indicated that they went in, bought some water at a small kiosk located in the plaza, and that Dr. Moonda had his wallet out and must have – everybody must have been seeing that wallet and that, you know, with the large amount of money in it and that Dr. Moonda was very open with that wallet and he, you know, never protected anybody from seeing the type of money that he would carry.
>
> She then advised that she decided to drive at that time. They arranged that, she went out and got the Jaguar, picked up Dr. Moonda, they continued west on the Ohio turnpike, and somewhere around 30 miles or so that Dr. Moonda started requesting to drive again because he – she always would read the maps and he would drive.
>
> So she found an emergency pull off that wasn't occupied, she would – she pulled over. She looked in her mirrors, she saw no vehicle behind her, nobody around.
>
> As they started exiting the car, as she was getting out, there was a man she described in dark clothing, short, about Dr. Moonda's

(4:06 MJ 6049)

> height, approached Dr. Moonda with a mean hateful voice and demanded his money and ordered him into the car.
>
> She said at that time Mr. Moonda or Dr. Moonda asked for his wallet that was in her purse. She got back in the car and handed Dr. Moonda the wallet.
>
> Dr. Moonda handed the wallet to the suspect, and the suspect – she said she heard some type of a muffled pop but she wasn't sure what happened and she didn't – the suspect took off.
>
> And she realized that the doctor was shot. She started CPR on the doctor, and performed it until the rescue arrived, I believe, or sometime until the EATS arrived.

Continuing, Goodhart recounted the receipt of reports as early as May 19, possibly connecting the defendant and Damian Bradford in the following testimony:

> What, if any, information did you learn in the next week that caused you any concern or doubt that this was a highway robbery?
>
> A. From May 13th or just on the 19th to the 20th?
>
> Q. Specifically the 19th to the 20th.
>
> A. Okay. We received later on the 19th, it would be a Thursday, later in the evening, we received pretty close to simultaneously two reports, one from an anonymous or wanted to be anonymous caller calling into Pittsburgh – I'm sorry – the Pennsylvania State Police advising that –
>
> MR. SYNENBERG: Objection. Your Honor.
>
> THE COURT: Well, it's very clear that hearsay evidence is admissible for the purpose of determining whether or not there should be a bindover to the grand jury.
>
> At the time, if in fact the defendant is indicted, then the rules against hearsay apply and obviously much of what I've heard here already constitutes hearsay, but it's – there's no restriction on hearsay testimony at this point so the objection is overruled.

(4:06 MJ 6049)

> A. There was a call into Pennsylvania State Police that Mrs. Moonda was having a – was in rehab down in the Gateway in the Monaca or Aliquippa which is Beaver County area of Pennsylvania, and was involved with a sexual relationship with a gentleman by the name of Damian.

Goodhart then reported that the investigation linked Damian Bradford as the person identified as "Damian."

After Damian Bradford was interviewed and reported on the use of cell phones, the investigation eventually linked the defendant and Damian Bradford in the use of cell phone and the texting of messages between the two.

Subsequent discoveries of Dr. Moonda's personal effects along the eastbound lane of the Ohio Turnpike and east of the site of the homicide were described in the following testimony:

> Q. Now, were any personal effects of Dr. Moonda found alongside the Ohio turnpike subsequent to May 13th of 2005?
>
> A. Yes. Probably, I believe it was June 17th, some of his credit cards were found in the inside medial east, off the eastbound lanes around the 176 mile post which is in Summit County.
>
> Q. Anything else subsequent to that day?
>
> A. No. We – when we found the items there, again we did the extensive search of the medials, but those were the only items found at that time.
>
> July 30, his wallet was found by a hunter that was checking the fence line that butts up against the national park. It was the same area, only it was completely off the right side of the road over an embankment.
>
> After that, the first of August, part of August, it was either August 2nd or somewhere in there, we did a search of the right side of the roadway of that embankment, and we were able to recover Dr. Moonda's driver's license and some business cards and I'd have to

8

(4:06 MJ 6049)

        look at the records to tell you what else we recovered at that time but –

Q.     As far as the wallet goes, how were you able to identify that it had belonged to Dr. Moonda?

A.     It was a specific make of a wallet. It was brown in color, and there was some credit cards in there yet from Dr. Moonda.

Damian Bradford was subsequently indicted for the stalking death of Dr. Moonda and, on July 24, 2006, entered a plea of guilty and previously implicated the defendant in a July 21, 2006 statement as described by Sergeant Goodhart in part as follows:

Q.     And on July 21st of this year, in anticipation of entering a guilty plea, did Mr. Bradford provide a statement to investigators, including yourself?

A.     Yes, he did.

Q.     And what did he tell you generally?

A.     Generalization of the statement is that he admitted to meeting with Mrs. Moonda at 12:00 o'clock in the Lawrence county area. She provided him a map quest directions of the route that they would be taking.

        He then said he was sitting – he went up and sat up in the Hermitage area. When she texted him, she told him at noon that "You'll know when we're leaving."

        He then followed them. He did lose sight of them for a short period of time through Sharon but following the map quest directions he caught back up to them as they were coming out of the Sharon area.

Q.     Sharon being in Pennsylvania?

A.     Sharon, Pennsylvania.

        He followed them on to the Ohio turnpike. He was not in the exact same lane as them but he was – he got on at the same time.

9

(4:06 MJ 6049)

>He followed them to the service plaza. He waited at the service plaza. At that time he saw Mrs. Moonda come out to the car. He then followed them from the service plaza to the location of the shooting at the 164.2 at which time Mrs. Moonda went from the center lane to the emergency pulloff. He followed.
>
>As he was getting out of the car, he said Dr. Moonda was already getting out of the car. He hustled up to the right side with a gun and as he looked at Dr. Moonda he saw the fear in his face. When he said Dr. Moonda put his hands up, he ordered him back into the car and demanded his money.
>
>Dr. Moonda gave him his wallet, and then he shot him in the side of the head.
>
>And ran back to the car and left.

Q. Now, did he give you any information regarding any planning that he gone on between him and the defendant in this case?

A. He indicated that Donna Moonda was talking about probably sometime in December looking for somebody to kill her husband.

>In sometime after that, they started talking about that she would give him half of her inheritance that she would kill him – or if he would kill him, kill Dr. Moonda.
>
>They then went into – started planning probably a few weeks prior that she said we can kill him on the turnpike, basically when we do this trip and we'll make it look like a robbery.
>
>She was supposed to give a complete opposite description. They traveled or and then that she would meet, give him the map or get with him Friday to give him the directions.
>
>So when she called Friday morning, that he knew that he needed to go meet her for the map.

Q. Did he acknowledge receiving a text message late in the afternoon on May 13th and knowing that they were leaving?

A. Yes.

10

(4:06 MJ 6049)

> Q. Now, was there any concern on their part that Mrs. Moonda would be near the vehicle and of course near Dr. Moonda when the gun would be fired?
>
> A. Right. They – they talked about it. He said he was not concerned. He used a hollow point round and he knew it would not go through Dr. Moonda.
>
> Q. Was there any indication that she would be wounded?
>
> A. She requested that he would give her a flesh wound, also.
>
> Q. What was his response to that?
>
> A. He told her no, he was not going to do that.

### III. AN ANALYSIS OF 18 U.S.C. § 3142

Title 18, United States Code, § 3142(f) calls for an evidentiary hearing and the judicial officer is "to determine whether any condition or combination of conditions . . . will reasonably assure the appearance of such person as required and the safety of any other person and the community[.]"

Section 3142(g) indicates, as follows, the factors to be considered by the judicial officer in determining whether there are conditions of release that will assure the appearance of the defendant and the safety of any other person and the community:

> (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed or involves a narcotic drug;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including –

11

(4:06 MJ 6049)

    (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

  (4) The nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

Section 3142(e) also provides for a "rebuttable presumption" supporting an order of detention with respect to certain charged offenses including an offense under 18 U.S.C. § 924(c). On August 1, 2006, the Court published an order (Doc. No. 5) indicating that its initial research concluded there was no rebuttable presumption with respect to the offense charged against the defendant under the provisions of 18 U.S.C. §§ 2261A, 924(j) and 2. The Court suggested that counsel respond to the Court's view in briefs to be filed no later than August 1, 2006. Only the government addressed the issue of the application of the "rebuttable presumption" as set forth in 18 U.S.C.§ 3142(e)[2] in its brief. (See Doc. No. 6.)

Section 3142(e) provides in relevant part as follows:

  Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed . . . an offense under section 924(c) . . . of this title . . . .

---

[2] The Court's order of August 1, 2006, mistakenly identified the "rebuttable presumption" as listed in 18 U.S.C. § 3142(d), when in fact the discussion of "rebuttable presumption" appears in 18 U.S.C. § 3142(e).

12

(4:06 MJ 6049)

In this case, the Court has found probable cause to believe that the defendant committed an offense, as charged, under the provisions of 18 U.S.C. § 924(j).[3]

In its brief in favor of detention, the government argues that because the language of 18 U.S.C. § 924(j) tracks the language of § 924(c), the "rebuttable presumption" contained in 18 U.S.C. § 3142 applies. The Court agrees. Therefore, it will consider the "rebuttable presumption" in the context of its duty to consider the § 3142(g) factors in determining whether to order detention.

## IV.  THE APPLICABLE CASE LAW IN THE SIXTH CIRCUIT

The Sixth Circuit has considered an attack on an order of detention in a number of unpublished opinions. See, e.g., U.S. v. Hoskins, No. 99-5425, 1999 WL 282678 (6th Cir. Apr. 19, 1999); U.S. v. Sexton, No. 99-6660, 2000 WL 191667 (6th Cir. Feb. 3, 2000); U.S. v. Legg, No. 00-5209, 2000 WL 553990 (6th Cir. Apr. 28, 2000); U.S. v. Romans, No. 00-5456, 2000 WL 658042 (6th Cir. May 9, 2000); U.S. v. Zimmerman, No. 00-3361, 2000 WL 660240 (May

---

[3] 18 U.S.C. Section 924(j) states:

A person who, <u>in the course of a violation of subsection (c)</u>, causes the death of a person through the use of a firearm, shall –

(1) if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life; and

(2) if the killing is manslaughter (as defined in section 1112), be punished as provided in that section.  (Emphasis added).

(4:06 MJ 6049)

11, 2000); U.S. v. Miller, 39 Fed. Appx. 278 (6th Cir. 2002); U.S. v. Ortiz, 71 Fed. Appx. 542 (6th Cir. 2003).

      The opinion in the Sexton case provides an outline for the judicial process. The detention hearing was described as lengthy including testimony of the special agent involved in the investigation and an additional nine witnesses testifying on behalf of the defendant, plus a stipulation regarding the testimony of an additional 27 witnesses. Detention was ordered. The Sexton court then opined:

> A defendant shall be detained pending trial if, after a hearing, the judicial officer finds that no condition or set of conditions will reasonably assure the defendant's appearance and the safety of the community. 18 U.S.C. § 3142(e). The factors that the judicial officer is to examine, as _____ 18 U.S.C. § 3142(g), include the nature and circumstances of the offense charged; the weight of evidence against the person; and the nature and seriousness of the danger posed by the defendant's release. Subject to rebuttal by the defendant, there is a presumption in favor of pretrial detention if the judicial officer finds there is probable cause to believe that the person committed an offense . . . . Upon the defendant's introduction of some evidence in support of release, the presumption does not disappear but remains as one evidentiary factor to be evaluated. United States v. Jessup, 757 F.2d 378, 384 (1st Cir.1985); see also United States v. Rueben, 974 F.2d 580, 586 (5th Cir.1992), cert. denied, 507 U.S. 940 (1993); United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir.1991); United States v. Hare, 873 F.2d 796, 798 (5th Cir. 1989).

2000 WL 191667, at *1 (underlined space in original).

      The above cited Sixth Circuit cases have in common a charge of a drug offense, usually a charge related to a conspiracy with respect to cocaine and consideration of the rebuttable presumption set forth in 18 U.S.C. § 3142(e). However, the defendant's well written brief opposing detention cites four murder cases in which either an order of detention in a murder case was reversed by the circuit court, or where a district court denied the government's request for

14

(4:06 MJ 6049)

detention in a murder case.  See Drew v. United States, 384 F.2d 314 (D.C. Cir. 1967); Stinnett v. United States, 387 F.2d 238 (D.C. Cir. 1967); White v. United States, 412 F.2d 145 (D.C. Cir. 1968); United States v. Gray, 651 F.Supp. 432 (W.D. Ark. 1987).  Drew, Stinnett and White have in common the reversal of a detention order issued by the trial court with a dissent in each of the three cases.  None of the opinions in Drew, Stinnett or White discuss or make reference to the "rebuttable presumption" of 18 U.S.C. § 3142(e).[4]

Consequently, the Court concludes that its consideration of whether to order the defendant's detention or, in the alternative, the defendant's release with conditions, should address the factors to be considered under the directions of 18 U.S.C. § 3142(g), in conjunction with its holding that the "rebuttable presumption" of 18 U.S.C. § 3142(e) applies.

---

[4] These three cases were decided long before the current statute was enacted as part of the Comprehensive Crime Control Act of 1984, Pub.L. 98-473, Title II, § 203(a), Oct. 12, 1984, 98 Stat. 1976.  Prior to this major statutory overhaul, there was a presumption that a defendant should be released on personal recognizance.  See 18 U.S.C. § 3146(a) (1966) ("[a]ny person charged with an offense, other than an offense punishable by death, shall . . . be ordered released pending trial on his personal recognizance . . . unless the [judicial] officer determines, in the exercise of his discretion, that such a release will not reasonably assure the appearance of the person as required.").  Notwithstanding the "other than" language of § 3146, 18 U.S.C. § 3148 (1966) provided that even a person "charged with an offense punishable by death . . . shall be treated in accordance with the provisions of section 1346 unless the court or judge has reason to believe that no one or more conditions of release will reasonably assure that the person will not flee or pose a danger to any other person or to his community."
   Section 3142, enacted as part of the 1984 overhaul, injected the concept of a presumption, although a rebuttable presumption, "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed [certain specified crimes]."  In other words, just by virtue of having been charged with the commission of certain specified crimes, the presumption is that the person should not be released.  This is quite the opposite of any presumption under the former statutory structure.

(4:06 MJ 6049)

## V. THE COURT'S FACT FINDINGS AND RULING [5]

### A. The Court's consideration of the sentencing factors under 18 U.S.C. § 3142(g)

First, in response to 18 U.S.C. §3142(g)(1), the defendant is charged with a crime of violence. Secondly, in response to subsection (g)(2), the Court finds, based on the unopposed recitation of the evidence against the defendant as set forth in part herein, the weight of the evidence against the defendant suggests that she planned the setting for the homicide; enlisted Damian Bradford to carry out the homicide; planned the homicide for the express purpose of sharing in the estate of her husband; promised Damian Bradford a share of the proceeds that would flow to her upon the death of her husband and, following the homicide, provided a description of the killer that would eliminate Bradford as the killer. In conclusion, at this point in the proceedings, and prior to any grand jury action, the Court finds the weight of the evidence against the defendant is strong.

In response to subsection (g)(3), the Court finds that the defendant has strong family ties to the community; has no criminal record; has a nursing background, but suffers from drug problems, i.e. the intake of fentanyl; is currently under the care of a psychiatrist and takes medicine for depression for a sleep disorder. Despite her nursing background, the defendant is presently unemployed and her nursing license expired in August of 2005. The Court further

---

[5] Either party, the government or the defendant, has standing in the Sixth Circuit Court of Appeals to challenge an adverse ruling. Mindful of that possibility, the Court has elected to avoid using the brief form normally used to rule on a motion for detention in favor of a more explicit discussion of the evidence as presented by the government in support of detention. Much of what was presented by the government was in the form of hearsay testimony and, in ruling on a motion for detention, the Court is allowed to consider hearsay testimony that would be inadmissable during the trial that may follow.

16

(4:06 MJ 6049)

finds that the defendant is presently on probation but that the offense for which she was charged is subject to being dismissed upon a successful completion of the probation. The Court further finds that the defendant did not engage in flight when there was a media disclosure that Damian Bradford was expected to plead guilty on July 24, 2006 and, when advised of the filing of the criminal complaint in this case, she surrendered forthwith.

In response to subsection (g)(4), the Court finds that the apparent planning for some time of the killing of her husband and the detailed planning of the homicide strongly suggests that she remains capable of being a danger to any person or the community if released.

The Court also finds that the defendant has sufficient assets to fund a flight from further prosecution and has not offered any evidence to overcome the strong weight of the evidence against her.[6]

## B. The failure of the defendant to overcome the 18 U.S.C. § 3142(e) rebuttable presumption in favor of detention

A consideration of the sentencing factors as earlier outlined supports an order of detention. Additionally, the Court finds that the defendant has failed to rebut the presumption that applies in this case.

---

[6] The defendant's brief in favor of pretrial release argues that the government's case is based solely on circumstantial evidence, apparently in denial of the information provided by Damian Bradford who has acknowledged the killing of the defendant's husband in the presence of the defendant and consistent with the plan allegedly proposed by the defendant. No direct evidence has been provided by the defendant to support her claim of innocence other than to argue in her brief that the Court should decline to rely upon the evidence as to Bradford's proffer and the fact of his plea of guilty in front of this judge.

(4:06 MJ 6049)

### C. Conclusion

The Court finds that there is no condition or combination of conditions that will reasonably assure the appearance of the defendant as required and the safety of any other person and the community.[7]

### VI. THE COURT'S DIRECTIVES

Pursuant to 18 U.S.C. § 3142(i)(2)-(4), the Court directs that:

The defendant be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal; and

The defendant be afforded reasonable opportunity for private consultation with her counsel; and

That, on order of a court of the United States, or on request of an attorney for the Government, the person in charge of the corrections facility in which the defendant is confined deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

---

[7] 18 U.S.C. Section 3142(j) provides that "nothing in this section shall be construed as modifying or limiting the presumption of innocence." As a consequence, none of the findings made by the Court in issuing the detention order will be of any evidentiary value of any sort in the trial of the defendant in the event the Grand Jury hereafter indicts the defendant for the crime charged in the complaint. The Court is mindful of the extensive publicity that has accompanied this case. In the event the defendant is indicted and the case is assigned to this branch of the court, it is certainly not beyond the realm of possibility that the defendant will elect to move the Court for a change of venue. However, such a possibility and the Court's handling of such a motion, remains for another day.

(4:06 MJ 6049)

    IT IS SO ORDERED.

| | |
|---|---|
|  August 2, 2006 |  */s/ David D. Dowd, Jr.* |
| Date | David D. Dowd, Jr. |
| | U.S. District Judge |